United States District Court
Southern District of Texas
**ENTERED**
August 09, 2016
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| OSARETIN FRED OMOKARO, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| vs. | § | CIVIL ACTION H-15-2465 |
| | § | |
| RICKY HAMILTON, FIELD OFFICE | § | |
| DIRECTOR, HOUSTON, et al. | § | |
| | § | |
| Respondents. | § | |

## MEMORANDUM OPINION & ORDER

Pending before the court is a motion to dismiss petitioner Osaretin Fred Omokaro's complaint, or alternatively, a motion for summary judgment, filed by Ricky Hamilton, Field Office Director, Houston Field Office, Sharon A. Hudson, District Director, Houston, and Jeh C. Johnson, Secretary, Security of Homeland Security (collectively, "Respondents"). Dkt. 12. Having reviewed the motion, response, reply, the applicable law, and the record evidence, the court is of the opinion that the motion should be GRANTED.

### I. BACKGROUND

Petitioner Omokaro is a United States Citizen by naturalization. Dkt. 12 at 2. Asteria John Kirari, a native and citizen of Tanzania, has been the beneficiary of four petitions for alien relative ("I-130 petition") filed by three different husbands: Charles Bell, Jerome Nixon, and Omokaro. The table below provides a time line of Kirari's marriages and the I-130 petitions filed on her behalf:

| **Marriage** | **Visa I-130 Petitioner** | **I-130 & I-485 Filed** | **Date of Denial** |
|---|---|---|---|
| December 30, 2001 | Charles L. Bell | March 11, 2002 | June 24, 2004 |
| July 24, 2004 | Jerome Nixon | November 4, 2004 | February 21, 2006 |
| | | January 28, 2008 | September 17, 2009 |
| September 25, 2009 | Osaterin Omokaro | October 8, 2009 | August 26, 2010 |
| | | | December 17, 2013 |

Omokaro filed an I-130 petition on behalf of his wife, Kirari, on October 8, 2009. Dkt. 13 at 1. Kirari subsequently filed an application to register permanent residence ("I-485 petition"). On January 22, 2010, the United States Citizenship and Immigration Service ("USCIS") interviewed Kirari and Omokaro. Dkt. 12, Ex. 2 at 2. On July 9, 2010, the USCIS issued a notice of intent to deny the petition based on its finding that Kirari had previously entered into two sham marriages to Bell and Nixon in violation of section 204(c) of the Immigration Nationality Act, 8 U.S.C. § 1154(c). *Id*. at 3. In determining that the Kirari-Nixon marriage was a sham, the USCIS relied, in part, on interviews of Kirari and Nixon that were conducted on March 24 and March 25, 2005. Dkt. 12, Ex. 3 at 2–3. Kirari responded to the notice of intent to deny Omokaro's I-130 petition by filing a sworn affidavit in an attempt to explain the alleged discrepancies arising from the March 2005 interviews. Dkt. 12 at 15. On August 26, 2010, the USCIS denied Omokaro's I-130 petition, along with Kirari's I-485 petition, based, in part, on its determination that Kirari's sworn affidavit was not credible. Dkt. 12, Exs. 2, 3. On January 12, 2012, the USCIS denied Omokaro's motion to reconsider the denial. Dkt. 12 at 15. On January 13, 2012, Omokaro appealed the I-130 denial to the Board of Immigration Appeals ("BIA"). *Id*. On March 15, 2013, the BIA remanded the appeal to respondent Ricky Hamilton, the Field Office Director. *Id*. On August 22, 2013, a second notice of intent to

deny the I-130 petition was issued. *Id*. After considering Omokaro's response to the second notice, the USCIS again denied the I-130 petition on November 13, 2013. *Id*. at 16.

On December 17, 2013, Omokaro filed a second appeal to the BIA. *Id*. On July 28, 2015, the BIA dismissed the appeal and upheld the USCIS's finding that "the record contained substantial and probative evidence of marriage fraud based on [Kirari's] marriages to her first two husbands." Dkt. 12, Ex. 4 at 3. On August 25, 2015, Omokaro filed this complaint, challenging the denial of Omokaro's I-130 petition under the Administrative Procedure Act ("APA") and asserting various constitutional claims. Dkt. 1. On December 12, 2015, Respondents filed a motion to dismiss Omokaro's complaint, or in the alternative, a motion for summary judgment. Dkt. 12. On December 31, 2015, Omokaro filed a response (Dkt. 13), to which Respondents filed a reply (Dkt. 14).

## II. LEGAL STANDARDS

### A. Motion to Dismiss

Federal courts are courts of limited jurisdiction and the federal rules of civil procedure permit a court to dismiss a complaint because of lack of subject-matter jurisdiction or a party's failure to state a claim upon which the court can grant relief. *See Kokkenen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S.Ct. 1673 (1994); *see also* Fed. R. Civ. P. 12(b)(1), (6). Unless a statute or the Constitution confers jurisdiction, federal courts lack the power to adjudicate claims and must dismiss an action. *See Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998); *see also* Fed. R. Civ. P. 12(h)(3) (requiring that a court dismiss an action if it lacks subject matter jurisdiction). As the party invoking the subject matter jurisdiction of this court, petitioner bears the burden of demonstrating that this court has the requisite subject matter jurisdiction to grant the relief he requests. *See Kokkonen*, 511 U.S. at 375; *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511

(5th Cir. 1980). In evaluating whether subject matter jurisdiction exists, the court accepts all uncontroverted, well-pleaded factual allegations as true. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683 (1974).

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 816 (5th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937 (2009). "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555. As part of the *Twombly-Iqbal* analysis, the court proceeds in two steps. First, the court separates legal conclusions from well-pled facts. *Iqbal*, 556 U.S. at 678–79. Second, the court reviews the well-pled factual allegations, assumes they are true, and then determines whether they "plausibly give rise to an entitlement of relief." *Id.* at 679.

**B.      Summary Judgment**

A court shall grant summary judgment when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[A] fact is genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party." *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material

fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). If the party meets its burden, the burden shifts to the non-moving party to set forth specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e). The court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant. *Envtl. Conservation Org. v. City of Dall., Tex.*, 529 F.3d 519, 524 (5th Cir. 2008).

**C.     Review of Administrative Decisions**

A reviewing court may set aside an administrative decision only where the petitioner establishes that the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also City of Dall., Tex. v. Hall*, 562 F.3d 712, 717 (5th Cir. 2009) (citing *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 375–76 (1989); *Kleppe v. Sierra Club*, 427 U.S. 390, 412, 96 S.Ct. 2718 (1976)). Review under this standard is "narrow and highly deferential, requiring only that the agency 'articulate a rational relationship between the facts found and the choice made.'" *City of Abilene v. EPA*, 325 F.3d 657, 664 (5th Cir. 2003) (citations omitted). Under this deferential standard, the reviewing court may not substitute its own judgment for that of the agency. *Id*. In reviewing agency action under the "arbitrary, capricious, abuse of discretion, contrary to law" standard of review specified in the APA, 5 U.S.C. § 706(2)(A), "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142, 93 S. Ct. 1241 (1973).

In this case, the USCIS denied Omokaro's I-130 petition and the BIA affirmed that decision on appeal based on the USCIS's finding that Kirari had previously entered into two sham marriages in violation of 8 U.S.C. § 1154(c)(1). To support a finding of marriage fraud under § 1154(c)(1),

there must be "substantial and probative evidence" to indicate that the beneficiary entered, attempted to enter, or conspired to enter into a marriage "for the purpose of evading the immigration laws." *See* 8 C.F.R. § 204.2 (a) (1) (ii). However, that standard merely requires "'more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Brown v. Napolitano*, 391 F. App'x 346, 350 (5th Cir. 2010) (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)); *see also Omagah v. Ashcroft*, 288 F.3d 254, 258 (5th Cir. 2002) ("The substantial evidence standard requires only that the BIA's decision be supported by record evidence and be substantially reasonable." (citation omitted)). In the context of determinations made by the BIA, the Fifth Circuit has held that "[t]o obtain a reversal of the board's decision . . . the alien must show that the evidence he presented was so compelling that no reasonable fact-finder could fail to arrive at his conclusion," and that "[t]he evidence must not merely support the alien's conclusion but must compel it." *Brown,* 391 F. App'x at 350 (quoting *Silwany-Rodriguez v. I.N.S.*, 975 F.2d 1157, 1160 (5th Cir. 1992) (citations omitted)).

### III. DISCUSSION

#### A.    Subject Matter Jurisdiction

Respondents assert that "[t]his court lacks subject matter jurisdiction over the complaint because Petitioner is seeking to turn his APA claim into a constitutional and international law claim." Dkt. 12 at 3. However, Respondents do not dispute that this court has jurisdiction over Omokaro's APA claim challenging the BIA's decision to affirm the USCIS's denial of Omokaro's I-130 petition. Indeed, the Fifth Circuit has held that district courts have subject matter jurisdiction to review the denial of I-130 petitions. *Ayanbadejo v. Chertoff*, 517 F.3d 273, 278 (5th Cir. 2008) (finding that "[d]eterminations regarding the validity of marriage for I-130 petition purposes are not

discretionary within the meaning of § 1252(a)(2)(B), and thus are subject to review by courts"). Accordingly, this court has subject matter jurisdiction to review the decision denying Omokaro's I-130 petition.

**B.     Omokaro's APA Claim**

Omokaro requests that the court "[e]nter an order vacating the Respondents' [order] declaring Beneficiary's previous marriage a sham (*the basis of the denial of Mr. Omok[a]ro's I-130 petition and Asteria Kirari's adjustment of status application*) and declaring that Asteria Kirari is prima facie eligible for an adjustment of status." Dkt. 6 at 17.

Once an I-130 petition is filed, the Attorney General is directed to investigate and, if appropriate, approve the petition "if he determines that the facts stated in the petition are true and that the alien [o]n behalf of whom the petition is made" qualifies as an "immediate relative" as that term is defined by law. 8 U.S.C. § 1154(b). However, section 1154(c) prohibits the Attorney General from granting an I-130 petition if:

> (1) the alien has previously been accorded, or has sought to be accorded, an immediate relative or preference status as the spouse of a citizen of the United States . . . by reason of a marriage determined by the Attorney General to have been entered into for the purpose of evading the immigration laws, or (2) the Attorney General has determined that the alien has attempted or conspired to enter into a marriage for the purpose of evading the immigration laws.

*Id*.

Courts have held that a marriage is "a sham if the bride and groom did not intend to establish a life together at the time of their marriage." *Brown v. Napolitano*, 391 F. App'x 346, 351 (5th Cir. 2010) (quoting *Bark v. Naturalization and Immigration Serv.*, 511 F.2d 1200, 1201 (9th Cir. 1975)). In *Ayanbadejo v. Napolitano*, a court in this district explained that "[w]here the legitimacy of a

marriage is called into question, the petitioner must present documentary or testimonial evidence to show that it was not entered into for the primary purpose of evading the immigration laws." No. 4:06-cv-1177, 2009 WL 2996992, at *5 (S.D. Tex. Sept. 15, 2009) (Atlas, J.); *see also Matter of Phillis*, 15 I. & N. Dec. 385, 385 (BIA 1975) (holding that where there is reason to doubt the validity of the marital relationship, the petitioner must present evidence to show that the marriage was not entered into for the purpose of evading the immigration laws).

In determining the intent at the time of marriage, evidence considered may include joint ownership of property, commingling of financial resources, birth certificates of children born of the marriage, affidavits of third parties having knowledge of the bona fides of the marriage, or any other documentation establishing that the marriage was not entered into for the purpose of evading immigration laws. 8 C.F.R. § 216 (4)(a)(5). Any inconsistencies in the submitted documents or in the sworn testimony provided during the interviews may be the basis for denial of the petition. *See Matter of Phillis*, 15 I. & N. Dec. at 387 (finding that "the inconsistencies between the statements of the petitioner and the beneficiary . . . with reference to their living arrangements" was "particularly significant" in finding that the parties entered into the marriage for the purpose of obtaining immigration benefits).

In this case, the reviewing official at the USCIS denied Omokaro's petition based on the finding that there was "substantial and probative evidence" that Kirari previously entered into two sham marriages for the purpose of conferring immigration benefits in violation of 8 U.S.C. § 1154(c). *See* Dkt. 12, Exs. 2, 3 (notice of intent to deny visa petition). After Omokaro's second appeal, the BIA affirmed the USCIS's decision, finding that "the Director correctly determined that the current visa petition cannot be approved because the record contains substantial and probative

8

evidence of prior marriage fraud by the beneficiary." Dkt. 1, Ex. 1 at 3–4.  Specifically, the BIA affirmed the USCIS's findings that *both* of Kirari's previous marriages were sham marriages. *Id.* at 3.  Omokaro alleges that Respondents' decision was arbitrary, capricious, and an abuse of discretion.  Dkt. 6 at 14.  The court will summarize the evidence relied upon by the USCIS and the BIA in determining that Kirari's first two marriages were sham marriages.

### 1. Kirari-Bell Marriage

Bell and Kirari's marriage license states that they married on December 30, 2001.  Dkt. 12, Ex. 2 at 3.  However, Bell's I-130 petition listed December 31, 2001 as their marriage date.  *Id.*  During the first year of their marriage, Bell married two additional women on July 18 and November 5 of 2002.  *Id.*  Moreover, Kirari and Bell failed to provide any substantive evidence showing that (i) they ever lived at the same address or (ii) that they ever combined their lives financially.  *Id.*  Finally, despite being married to Bell, Kirari filed her taxes as a single person for 2002.  *Id.*  Therefore, in finding that the Kirari-Bell marriage was a sham, the BIA and the USCIS primarily relied on the "potential tax fraud" committed by Kirari, the lack of proof of living together or combining their lives financially, the false and incomplete information on Bell's I-130 petition, and the fact that Bell married two additional women during the early part of his marriage with Kirari.  Dkt. 12, Ex. 2 at 3;  Dkt. 1, Ex. 1 at 3.

Omokaro has failed to address the USCIS's finding that the Kirari-Bell marriage was a sham in either the administrative record or in any of the filings before this court.  Even after the USCIS raised the issue of Bell's multiple marriages in the August 22, 2013 notice of intent to deny, Omokaro failed to acknowledge or address the issue.  In its decision affirming the USCIS's denial of the I-130 petition, the BIA relied, in part, on the fact that Omokaro has failed to contest the

9

finding that Kirari's marriage to Bell was a sham. Dkt. 1, Ex. 1 at 3. One prior marriage sham is all that is needed to make Kirari statutorily ineligible for immigration benefits under section 1154(c). Therefore, in light of the uncontroverted evidence supporting the USCIS's finding that the Kirari-Bell marriage was a sham, the court finds that the agency decision to deny the I-130 petition was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

### 2. Kirari-Nixon Marriage

In the interest of completeness, the court will also examine the evidence relied upon in determining that Kirari's marriage to Nixon was a sham. Kirari divorced Bell on June 24, 2004, and immediately thereafter married Nixon on July 24, 2004. Dkt. 12, Ex. 2 at 3. The USCIS interviewed Kirari and Nixon under oath on March 24 and March 25, 2005. *Id*. In deciding that the Kirari-Nixon marriage was fraudulent, the USCIS primarily relied on (i) seven discrepancies arising from Kirari and Nixon's interviews, (ii) a lack of documentation, and (iii) an affair between Kirari and Omokaro during the Kirari-Nixon marriage.

Omokaro takes issue with the USCIS's conclusion that the interviews of Kirari and Nixon "cast[ed] serious doubt as to the validity of their marital relationship." Dkt. 13 at 9–10. Omokaro complains that Kirari and Nixon were unfairly "asked an avalanche of questions (close to one hundred) about each other of which they answered all but eight right." *Id*. at 10. However, as Omokaro admits, the alleged discrepancies relate to "the relationships and interactions between [Kirari] and Mr. Nixon's adult children and other family members." *Id*. Omokaro failed to identify which questions were unfair.

Omokaro contends that all of the discrepancies "were nothing but unfortunate misunderstandings and as such have had no adverse bearing on the determination of the validity of

the marriage between the parties." Dkt. 13 at 12.  In an attempt to explain the discrepancies, Kirari submitted a sworn affidavit on September 20, 2010.  Dkt. 12, Ex. 3 at 2.  The USCIS found that the affidavit failed to provide a credible explanation for all but one of the noted discrepancies and noted that the affidavit "contain[ed] some of the exact language submitted previously by [Kirari's] attorney in response to the Notice of Intent to Deny."  *Id*.

>The seven discrepancies include the following:
>
>1. When the USCIS asked Kirari how many times she had interacted with Nixon's son, Justin, she claimed she had only seen Justin once, whereas Nixon claimed she had seen him at least six times.  Omokaro contends that Kirari was confused and thought she was being asked how many times she had met with Nixon's son outside their home (which was only once), not including the four or more times Justin spent the night at their home.  Dkt. 13 at 10.
>
>2. When asked where Kirari's parents live, Nixon testified that Kirari's parents live in Tanzania and that both of her parents were still living;  Kirari testified that her father had passed away seven years ago.  *Id*. at 10–11.  Omokaro claims this was another unfortunate mix-up:  although Kirari's biological father had passed away, "her mother had a live-in companion who [Kirari] also fondly referred to as 'papa' and this was why Mr. Nixon had said that [Kirari's] parents were in Tanzania."  *Id*. at 11.
>
>3. Kirari testified that she had never met Nixon's son Cedric; however, Nixon testified that Kirari met Cedric at his mother's house.  *Id*.  Kirari now claims that Nixon was mistaken and that in fact Kirari met Nixon's *daughter* at his mother's house, not Cedric.  *Id*.
>
>4. Nixon testified that for his mother's birthday in November 2004, Nixon's family (including Kirari) took Nixon's mother out to dinner.  *Id*.  Kirari stated that neither she nor Nixon bought Nixon's mother a gift or did anything for her birthday.  *Id*.  Omokaro claims that Kirari interpreted this outing to simply be a "family dinner" because the dinner was not on her actual birthday.  *Id*.
>
>5. Kirari testified that they had cable at home whereas Nixon testified that they did not.  Omokaro claims that their answers were inconsistent because they disagreed about whether "bootleg" cable qualified.  *Id*.

11

6. Nixon testified that his daughter, Jessica, had not lived with him since 2003; Kirari testified that Jessica and her baby had been living with Nixon and Kirari since August of 2004. *Id*. at 12. In her affidavit, Kirari clarified that, at the time of the interview, Jessica and her baby had been "staying at their residence for a couple of days." *Id*.

7. Nixon testified that he had voted in the last presidential election, while Kirari testified that he had not. *Id*. Omokaro claims that Kirari confused the primaries with the presidential election, and remembered that Nixon had not voted in the primaries. *Id*.

After considering Omokaro's explanations for the discrepancies, the USCIS concluded that they were not credible. In addition to these discrepancies, the USCIS considered the fact that during Kirari's marriage to Nixon, Kirari and Omokaro had an affair which resulted in Kirari giving birth to a child fathered by Omokaro. *See* Dkt. 12, Ex. 3. The BIA affirmed the USCIS's finding that the Kirari-Nixon marriage was a sham, noting additional discrepancies in the documentary evidence provided by Kirari and Nixon. Dkt. 1, Ex. 1 at 3 (noting conflicting evidence of Kirari's residential lease and her 2004 tax return).

Omokaro suggests that the USCIS and the BIA have improperly imposed their own personal views about what a real marriage constitutes, citing to *Damon v. Ashcroft*, 360 F.3d 1084 (9th Cir. 2001). Dkt. 13 at 13. However, no evidence has been provided to suggest that either the USCIS or the BIA concluded that Kirari's previous marriages were shams because they failed to conform to their personal views on marriage. Rather, the record is replete with evidence that Kirari entered into two marriages for the purpose of evading the immigration laws of the United States. Accordingly, the court finds that the denial of Omokaro's I-130 petition was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

**C.     Constitutional Claims**

In addition to his APA claim, Omokaro asserts substantive and procedural due process claims. With respect to his procedural due process claim, Omokaro asserts that his protected liberty interest in his right to marriage is being denied without due process because the USCIS and BIA

have "failed to give proper weight to the evidence debunking their flawed and untrue allegations that Kirari had previously entered into a sham marriage." *Id*. at 16. With respect to his substantive due process claim, Omokaro contends that his right to a familial relationship has been infringed upon. *Id*.

However, as Respondents point out, Omokaro "'essentially recast[ed] his arguments under the APA as constitutional ones. But arbitrary rulings do not necessarily infringe upon the right to due process, . . . By doing nothing more than dressing up their claims under the Administrative Procedure Act as constitutional violations, [Petitioner] failed to state a claim.'" Dkt. 12 at 22 (quoting *Ogbolumani v. Napolitano*, 557 F.3d 729, 735–36 (7th Cir. 2009)); *see also Ogbolumani v. Napolitano*, 523 F. Supp. 2d 864, 867 (N.D. Ill. 2007), *aff'd,* 557 F.3d 729 (7th Cir. 2009) (holding that mere dissatisfaction with the outcome of the I-130 adjudication and otherwise conclusory claims as to constitutional violations do not satisfy federal pleading requirements). In *Fiallo v. Bell*, 430 U.S. 787, 792, 97 S. Ct. 1473 (1977), the Supreme Court held that rational basis review is applied to constitutional challenges to immigration statutes, and under that review, "[a] statute is presumed constitutional, and the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." *Heller v. Doe*, 509 U.S. 312, 320, 113 S. Ct. 2637 (1993). Courts must accept a legislative classification "even when there is an imperfect fit between means and ends." *Id*. at 321.

In applying this review, in *Bright v. Parra*, 919 F.2d 31, 33 (5th Cir. 1990), and *Anetekhai v. INS*, 876 F.2d 1218, 1221, 1222 n.5 (5th Cir. 1989), the Fifth Circuit ruled that a citizen "has no constitutional right to have her [alien] spouse remain in the United States." *See also Hamdan v. Gonzales*, 425 F.3d 1051 (7th Cir. 2005); *Almario v. Att'y Gen.*, 872 F.2d 147, 152 (6th Cir. 1989). Moreover, Omokaro's constitutional challenge to 8 U.S.C. § 1154(c) fails on its face because the statute is related to Congress's legitimate interest in regulating immigration and discouraging

13

marriage fraud. Omokaro has offered no basis upon which the court could conclude that 8 U.S.C. § 1154(c) is not rationally related to that legitimate government purpose. For these reasons, Omokaro's substantive due process claim fails as a matter of law.

For his procedural due process claim, Omokaro must show that: (1) he had a protected liberty interest, and (2) the government did not afford appropriate process. *Mangwiro v. Napolitano*, 939 F. Supp. 2d 639, 645 (N.D. Tex. 2013) (explaining that procedural due process merely "require[s] some form of notice in administrative adjudications which may result in the denial of privileges conferred by the Government"), *aff'd*, 554 Fed. Appx. 255 (5th Cir. 2014). In *Mangwiro*, the court dismissed the plaintiffs' procedural due process claims relating to the USCIS's denial of their I-130 petition, finding that the plaintiffs were given appropriate notice by virtue of the fact that "they were provided with the [notices of intent to deny] that included the discrepancies in Plaintiffs' interview responses, and that Plaintiffs were allowed to respond to the discrepancies before the USCIS denied their 2008 and 2010 petitions." *Id*. at 645.

Omokaro's procedural due process claim fails because it is undisputed that Omokaro was provided the opportunity to submit evidence to challenge the USCIS's notices of intent to deny Omokaro's I-I30 petition. Indeed, Omokaro responded to the USCIS's notice and the USCIS properly considered the documents submitted. Moreover, Omokaro took advantage of his opportunity to appeal the USCIS's denial on two occasions. When Kirari initially appealed, the BIA remanded the case back to the USCIS, finding that "while the record raised a reasonable suspicion of fraud, the Director had not met his burden to establish substantial and probative evidence of marriage fraud." Dkt. 1, Ex. 1 at 3. After remanding the case, the USCIS issued a second notice of intent to deny the I-130 application and invited Omokaro to provide a rebuttal as to why the petition

should not be denied. Dkt. 12, Ex. 3 at 4. After considering Omokaro's response to the second notice, the USCIS again denied the I-130 on November 13, 2013. *Id*. at 16. After the second appeal, the BIA affirmed the USCIS's decision and issued a written decision detailing its reasoning for denying the petition. Dkt. 12, Ex. 4 at 3. Therefore, Omokaro received notice and an opportunity to be heard "at a meaningful time and in a meaningful manner." *Ghaly v. INS*, 48 F.3d 1426 (7th Cir. 1995). Accordingly, Respondents' motion is GRANTED as to Omokaro's constitutional claims.

### III. CONCLUSION

Based on the foregoing, Respondents' motion for summary judgment (Dkt. 12) is GRANTED as to Omokaro's APA claim and their motion to dismiss is GRANTED as to all other claims. Accordingly, Omokaro's complaint is DISMISSED WITH PREJUDICE.

Signed at Houston, Texas on August 9, 2016.

_____
Gray H. Miller
United States District Judge